Filed 7/27/22  P. v. Mejico CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B311150 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA033116) |
| v. | |
| STEVE ERENESTO MEJICO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Juan C. Dominguez, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Steve Erenesto Mejico (defendant) appeals from the order denying his petition filed pursuant to Penal Code former section 1170.95 (now § 1172.6).[1] Defendant contends that the trial court erred by treating the evidentiary hearing held pursuant to former section 1170.95, subdivision (d) as a trial de novo, that the trial court was collaterally estopped from finding that he could be convicted of first degree murder under the law as amended after his conviction of second degree murder, that this court should apply a de novo review to the sufficiency of the evidence, and that substantial evidence did not support the trial court's finding that he harbored malice. Finding no merit to defendant's contentions, we affirm the order denying defendant's petition.

## BACKGROUND

In 1997 defendant and his codefendant Glenn Tracchia, Jr., were each convicted by a jury of the second degree murder of Robert Imperial with true findings that a principal was armed with a firearm and that the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote and assist in criminal conduct by gang members. Defendant was sentenced to 16 years to life in prison. We affirmed the judgment in *People v. Tracchia* (B117379, Oct. 19, 1998) (nonpub. opn.).

---

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) All further statutory references are to the Penal Code, unless otherwise indicated.

2

**Former section 1170.95**

In 2018, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), which amended sections 188 and 189, the laws pertaining to felony murder and murder under the natural and probable consequences doctrine. "To amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) . . . : 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843.) This amendment effectively eliminated murder based upon the natural and probable consequences doctrine. (*Id.* at p. 850.)

The Legislature added former section 1170.95 (now § 1172.6), which provides a procedure for those convicted of murder to retroactively seek relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019. (Stats. 2022, ch. 58, § 10; Stats. 2018, ch. 1015; *People v. Lewis* (2021) 11 Cal.5th 952, 957.) If presented with a facially adequate petition, the court appoints counsel and then determines if the petitioner made a prima facie case for relief. (Former § 1170.95, subd. (c).) If so, the court must issue an order to show cause why relief should not be granted, as was done in this case, and an evidentiary hearing is held. (*Ibid.*; *Lewis*, at p. 971.) At the evidentiary hearing the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder, attempted murder, or manslaughter under amended sections 188 and 189. (Former § 1170.95, subd. (d)(3).) Both the prosecution and the petitioner are permitted to "offer new or additional

3

evidence." (*Ibid*.)  The trial court acts as an independent factfinder and determines whether the prosecution has met its burden.  (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984.)

**Defendant's petition**

In March 2020 defendant filed a petition for resentencing pursuant to former section 1170.95.  The trial court found defendant had made a prima facie case for relief upon showing that at his trial the jury was instructed on the natural and probable consequences doctrine, which had been argued to the jury.  An order to show cause issued and an evidentiary hearing was held pursuant to former section 1170.95, subdivision (d).

**Relevant 1997 trial evidence**

The parties stipulated at trial that the Dogpatch gang is a criminal street gang.  The prosecution's gang expert, Sheriff's Deputy Tommy Harris, testified to his familiarity with the Dogpatch gang and that the gang committed crimes such as robberies, burglaries, narcotics offenses, and assaults.  He added that crimes against other gang members were usually assaultive. David Valdez, who was also convicted of Imperial's murder, was a self-admitted member of the gang.  Defendant and Tracchia were also Dogpatch gang members.  Deputy Harris testified that in gang culture respect is important, and if the member of one gang disrespects another gang or one of its members, it can precipitate a rivalry.[2]  It is common when a gang or one of its members is disrespected that other members of that gang will try to regain respect by fighting with members of the rival gang, which leads to greater violence.  Regaining respect can range from "fighting or

---

[2]    Deputy Harris explained that the question, "Where are you from?" is intended to mean "what gang do you belong to?"

4

jumping somebody, all the way to murder." It is also common for gang members to carry weapons, mostly handguns.

On July 15, 1996, Imperial, his cousin Thomas Fierro and his cousin's friend Tom Bushnell went to Valdez's house. Bushnell was a tattoo artist and Valdez was a client. Neither Bushnell nor Fierro belonged to a gang. When Bushnell introduced his companions, Valdez said to Imperial, "This is Dogpatch. Where are you from?" Imperial replied that he was from La Mirada, meaning he was from the Varrio La Mirada gang. After drinking beer and smoking marijuana outside the house for approximately 45 minutes, they went inside. At some point Valdez called Bushnell into another room and asked whether Fierro and Imperial were both from La Mirada. Bushnell said that only Imperial was from La Mirada and offered to leave if there was a problem. Valdez told him not to worry, to "go ahead and kick back." About a half hour later first Valdez telephoned someone and then Imperial made a call, after which Valdez again used the telephone.

About half hour later, a car arrived. Valdez opened the door, and defendant, Tracchia, and an unidentified man entered the house. They introduced themselves to Fierro and Bushnell and identified themselves as Dogpatch gang members. Imperial told them he was "Porky" from La Mirada. Valdez, defendant, and the unidentified man went into the kitchen and spoke among themselves, while Tracchia sat on the couch in the living room next to Imperial and Fierro.

When Valdez, defendant, and the unidentified man came out of the kitchen, defendant asked Imperial, "Where are you from again?" When Imperial again said, "Porky from La Mirada," defendant replied, "Oh, we have to talk," or "Oh. Oh. We have to

talk." Defendant, Tracchia, Valdez, and the unidentified man positioned themselves two in front of Imperial and two behind him and "escorted" him outside to the front yard. One of them tried to shut the door behind them, but Fierro kept it open and sat on the corner of the couch so that he could watch as they stood in a semicircle surrounding Imperial for approximately 20 minutes. Defendant, Tracchia, Valdez, and the unidentified man appeared to be trying to explain something to Imperial, and on about four occasions the four men would huddle together and talk, then return to Imperial. At some point Fierro became concerned because of the look on Imperial's face, and he and Bushnell went outside to ask what was happening. Imperial said not to worry, that it was "just bull shit." At Imperial's request, Fierro and Bushnell went back inside but kept the door open.

Valdez came inside after about 10 minutes and went into his bedroom. Three to five minutes later he came out with a thick jacket and returned outside. Defendant and Tracchia, followed by Imperial and then Valdez, walked toward a gray or blue car that had not been there when Fierro had arrived at the house. The car was later identified as the blue Buick Regal owned by Tracchia's grandmother, which Tracchia regularly drove. Fierro ran outside and asked, "[W]here are you going?" Imperial told Fierro to go back inside and Valdez said they were going to buy beer and marijuana. Imperial got into the back seat of the car with Valdez, while defendant and Tracchia got into the front seat, and the car sped away. The unidentified man remained behind and appeared to be watching Fierro and Bushnell.

About 10:00 or 10:30 that evening, Eduardo Segoviano was walking down Wing Lane when he heard loud, angry voices and

saw two men pushing Imperial against a fence near a flood control channel. One man was pushing Imperial and the other striking him. Imperial broke away and ran in Segoviano's direction, as the assailants chased him, and fired a gun. Segoviano hid in a yard and heard more gunshots in quick succession. He saw flashes, but did not see the gun or which man had the gun. After the gunfire stopped, Segoviano heard tires spinning and the sound of a car driving away. When Segoviano emerged from hiding, the men were gone. He then saw Imperial lying in a yard.[3]

Another witness was in his nearby driveway when he heard a sound "like a backfire or a gunshot." When he looked in the direction of the sound, he saw a Buick Regal in the middle of the intersection with its headlights off. The witness heard two more gunshots before he saw the car speed away.

About 15 to 20 minutes after defendant and his companions had left with Imperial, the Buick Regal screeched to a stop in front of Valdez's house. (B117379 1 RT 96-97, 160)~ As Valdez got out, the unidentified man ran outside and got into the car, which sped away with its headlights off. Valdez hurried into the house sweating and looking shocked. He went to the bathroom, washed his face and hands, before going into his bedroom, then to his roommate's bedroom. When he came out he told everyone to get out. Both Fierro and Bushnell asked several times where

---

[3] Imperial was pronounced dead at the scene. He died from a single gunshot wound that penetrated his back, perforated a lung, and pierced his heart before lodging in the muscles of his chest. The path of the bullet was consistent with being shot while Imperial was running away.

Imperial was, but Valdez kept telling everyone to leave without answering them.

Fierro and Bushnell went outside where they saw Valdez come out, go to the side of the garage, and retrieve something wrapped in a piece of clothing. Bushnell approached and saw that Valdez was carrying a gun wrapped in a red rag. Valdez ordered Bushnell to "just fucking leave" and took the gun inside the house.

The next morning Valdez telephoned Bushnell and said, "[H]e's gone, huh?" Bushnell asked him, "[W]hy did you have to kill him?" Valdez replied that he had to shoot Imperial because "La Mirada was talking smut about Dogpatch."

During a search of Valdez's house, a .38-caliber revolver and ammunition were recovered from Valdez's bedroom. An expended bullet found at the scene of the shooting and the bullet recovered from Imperial's body were determined to have been fired by Valdez's gun. Prior to defendant's trial Valdez pled guilty to second degree murder. Valdez claimed defendant and Tracchia got out of the car with Imperial, and he remained in the car, where he heard a gunshot before defendant and Tracchia returned to the car without Imperial.

**The trial court's findings**

The trial court concluded that the evidence showed beyond a reasonable doubt that defendant acted with express or implied malice:

> "Although it is possible that the only thing [defendant] thought was going to take place at this remote location was the assault of [Imperial], said interpretation of the circumstantial evidence is not reasonable for the following reasons.

"Upon arriving at the Valdez residence, [Imperial] was immediately challenged as to his gang affiliation. In response to Valdez' question he stated he was from the 'La Mirada' street gang. Thereafter two phone calls followed, with [defendant] and the other two arriving about an hour later. They went into the kitchen and spoke. [Defendant] again asked [Imperial] what gang he claimed, and after [Imperial] responded, he stated 'Oh . . . we have to talk homey.' The discussion moved outside, and it appeared that [Imperial] was trying to explain something and had a concerned look on his face. During the discussion the gentlemen huddled together and spoke amongst themselves away from [Imperial].

"Immediately thereafter, Valdez went inside the house and came out holding a jacket. The circumstantial evidence points strongly to the fact that Valdez went to retrieve the gun. They then drove [Imperial] to a remote location where he was killed. Valdez told Tom Bushnell shortly after the shooting that he had killed [Imperial] because he had been 'talking smut about Dogpatch'.

"At trial Sgt. Harris testified as follows:

"Q: 'How is disrespect by one gang or one gang member or another gang towards another gang member answered by the gang or gang member disrespected?' . . .

"A: 'Well, they're going to go and try to regain that respect. It could be as little as fighting or jumping somebody, all the way to murder'.

"There appears to be no logical reason for taking [Imperial] to a remote location if the intent was simply to assault him. They were at Valdez' private residence and the assault could have taken

9

place right there and then. Furthermore, there appears to be no logical reason for the various separate discussions that took place prior to driving [Imperial] from the residence. Finally, [Imperial] was outnumbered 4 to 1. There appears to be no logical reason to retrieve a gun if the intent was only to assault. The circumstantial evidence strongly points to the conclusion that during the course of the various discussions the decision was made to kill [Imperial]. That explains why, prior to driving away from the location, Valdez went inside the residence to retrieve the gun.

"As the prosecutor stated during her argument at the eligibility hearing '[Imperial] was never going to come back alive once he got into the car with [defendant] and the others'. The court agrees with this conclusion.

"Lastly, [defendant] argued that the evidence established that only two of the individuals exited the car and chased [Imperial]. The other individual, which could have been [defendant], remained within the car and may not have been aware that the other two were going to kill [Imperial]. The court disagrees with this interpretation of the facts. The circumstantial evidence strongly points to the conclusion that the decision to kill [Imperial] was made prior to [his] entering the car and that by virtue of the various discussions, all were aware what was going to happen to [him]. Additionally, the evidence established that the vehicle belonged to Tracchia's grandmother and that he often drove the vehicle. Therefore, it would appear reasonable that it was Tracchia who remained with the car and that it was Valdez and [defendant] who chased [Imperial] and killed [him]."

10

The petition was denied on January 29, 2021. Defendant filed a timely notice of appeal. We affirm the order.

## DISCUSSION

### I.  Collateral estoppel and double jeopardy

Defendant initially contends that "by approaching the evidentiary hearing as a trial de novo and basing its denial of [defendant's] resentencing petition on a theory of the case previously rejected by the jury at trial, the superior court contravened the terms of [former] section 1170.95 and violated [defendant's] state and federal constitutional rights to due process of law." (Capitalization and boldface omitted.) We glean from the ensuing argument that defendant takes issue with the trial court's independent review of the evidence and its conclusion that defendant would be guilty of first degree murder under the amended murder statutes. Defendant argues that by finding defendant guilty of second degree murder, the jury necessarily found that defendant did not harbor an intent to kill; thus the trial court was collaterally estopped to find that defendant had an intent to kill, which finding was barred by the prohibition against double jeopardy.

Defendant's characterization of the proceedings as a trial de novo is an exaggeration, and defendant remains convicted of second, not first degree murder. "'[I]t is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under [former] section 1170.95, subdivision (d)(3).'" (*People v. Ramirez, supra*, 71 Cal.App.5th at p. 984.) In addition, "[a]n evidentiary hearing under [former]

11

section 1170.95 . . . does not implicate double jeopardy because section 1170.95 'involves a resentencing procedure, not a new prosecution.' [Citation.]  The retroactive relief provided by [former] section 1170.95 is a legislative 'act of lenity' intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 111.)

We need not address defendant's collateral estoppel challenge to the first degree murder finding, as the trial court also found the prosecutor had proven that defendant could still be convicted of second degree murder after the amendments to the murder laws.  Second degree implied malice murder was not eliminated by Senate Bill 1437. (*People v. Gentile, supra*, 10 Cal.5th at p. 850.)  "Though [Senate Bill 1437] abolished the natural and probable consequences doctrine, it maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged.  (§ 188.)" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).) One harbors implied malice when committing an act that is dangerous to life, knowing that it endangers the life of another, and does so with a conscious disregard for life.  (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106-107.)  Thus "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*People v. Gentile, supra*, at p. 850.)

## II. Substantial evidence of second degree murder
### A. *Standard of review*

Defendant contends that substantial evidence did not support the trial court's second degree murder finding. Relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), defendant contends that because the trial court's factual determinations were solely based on the cold record, this court should conduct an independent review, without giving deference to the trial court's findings as is usual in a substantial evidence review. We disagree. *Vivar* is an inapt comparison as it did not involve former section 1170.95, but a ruling on whether there had been a sufficient showing of prejudice to vacate a conviction by those facing negative immigration consequences—a ruling that was predominantly a *question of law*. (*Vivar*, at pp. 517, 524.)[4] Here, the issue is whether defendant knew his conduct endangered the life of another and acted with conscious disregard for life. (See *People v. Gentile, supra*, 10 Cal.5th at p. 850.) "'Evidence of a defendant's state of mind is almost inevitably circumstantial . . . .'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) It is thus "a question of fact based upon reasonable

---

[4] Moreover, as noted in *Clements*: "[T]he Supreme Court emphasized in *Vivar* that the 'embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence.' (*Vivar, supra*, 11 Cal.5th at p. 527.) The same factors don't support applying independent review in the context of reviewing a trial judge's ruling after a full hearing under [former] section 1170.95 subdivision (d)(3)." (*Clements, supra*, 75 Cal.App.5th at p. 302.)

13

inferences." (*People v. Hewlett* (1951) 108 Cal.App.2d 358, 377.) As the question presented is one of fact, we decline to apply a de novo review.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express (as when a defendant manifests a deliberate intention to take away the life

14

of a fellow creature) or implied.  [Citation.]  'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"  [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Thus defendant here must show that under no hypothesis was there sufficient evidence to support a finding that he knew his conduct endangered Imperial's life and acted with conscious disregard for that life.  (See *People v. Cravens, supra*, 53 Cal.4th at p. 507.)

### B.    *Defendant's contentions*

Defendant contends that there was *no* evidence that he harbored express or implied malice.  As we find ample evidence to support a finding of implied malice, we do not reach defendant's arguments regarding evidence of intent to kill.  (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 168.)

With regard to implied malice, defendant contends that the evidence failed to establish that he engaged in conduct dangerous to life or that he acted with a conscious disregard for life; and he contends that the trial court's findings were based upon mere speculation.  Defendant bases his contention on the claim that there was *no* evidence that defendant knew that Valdez was armed, which he infers from his claim that no one saw Valdez with a firearm before he left the house, that no one heard discussions of a plan for Valdez to arm himself, and that no gun was seen until *after* Imperial broke away from his assailants and

ran. Defendant is dismissive of the gang expert's testimony that it was "common" for gang members to carry a gun, arguing that it was not established that it was common for Dogpatch gang members to carry guns or that Valdez was known to carry guns. Defendant argues that even proof of knowledge that Valdez was armed with a gun would not support an inference of awareness by defendant that Valdez would use it to murder Imperial. Defendant concludes there was no credible, reliable or solid evidence showing his awareness that Valdez was armed or his intent to aid and abet Valdez in an assault with a firearm.

Defendant seems to equate circumstantial evidence with an absence of any evidence and conflicting inferences as speculative unless they favor the defense. In essence, after setting forth selected trial evidence, defendant has summarized the facts in the light most favorable to the defense and has drawn only those inferences that favor him. As stated above, we must view the record in the light most favorable to the judgment, even when the judgment rests primarily on circumstantial evidence (*People v. Kraft, supra*, 23 Cal.4th at p. 1053), and we "must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence" (*People v. Maury, supra*, 30 Cal.4th at p. 396). "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Regardless, we do not find defendant's inferences reasonable, and we disagree with much of defendant's version of the evidence. The evidence overwhelmingly supports the trial court's position that an inference that the Dogpatch gang

16

members intended a simple assault was unreasonable. Clearly, the four Dogpatch gang members took issue with Imperial's affiliation with La Mirada. As soon as Imperial arrived, Valdez learned his gang affiliation was La Mirada. Shortly thereafter Valdez made a phone call and then another, right after Imperial made a phone call. Within another half hour defendant, Tracchia, and the other man, all of whom identified themselves as Dogpatch gang members, arrived. Imperial again identified himself as Porky from La Mirada. After Valdez, defendant, and Tracchia conferred in the kitchen, defendant again asked Imperial what gang he claimed and observed, "Oh, we have to talk," or "Oh. Oh. We have to talk." The four Dogpatch gang members then "escorted" Imperial outside, surrounded him, and appeared to be explaining something to him between side conferences among themselves.

Defendant apparently infers from the absence of an identified rivalry between Dogpatch and La Mirada at the time that no violence was intended. However, the expert testified that in gang culture disrespect shown by a gang member to another gang or gang member can precipitate a rivalry, and regaining respect commonly involves fighting with members of the other gang, which may lead to greater violence, even murder. Defendant acknowledges Valdez reported that La Mirada had "talk[ed] smut" about Dogpatch, but dismisses this evidence because there was no evidence that "talking smut" required the murder of a person merely associated with the other gang. While that may be true there was evidence that such "smut" talking would require an assault with a deadly weapon: Valdez told Bushnell that he *had* to shoot Imperial because "La Mirada was talking smut about Dogpatch."

17

We agree with the trial court that the circumstances support the inference that Valdez retrieved a gun before the assault on Imperial and refutes defendant's inference that defendant did not know Valdez was armed. Immediately following the confrontation with Imperial in the front yard and conferring with his fellow gang members, Valdez went into his bedroom (the same room where sheriff's deputies later found the murder weapon) and came out with a jacket. Right after Valdez returned from the crime scene, he washed his face and hands, and soon after Bushnell saw Valdez with a gun wrapped in clothing and then in a cloth.

Defendant urges the inference that defendant did not know Valdez had a gun because the evidence did not show that anyone saw him with a gun before he left the house or heard discussions about Valdez arming himself. We disagree. Clearly defendant and his fellow gang members made some sort of plan that July evening that involved taking Imperial to another location in order to earn respect for their gang. Immediately after making the plan, Valdez went into the house and retrieved a thick jacket. In addition a fourth Dogpatch member remained behind in the house, apparently to watch Fierro and Bushnell.

As discussed above, the trial court reasonably inferred that defendant and his fellow gang members intended an assault. There was nothing in the evidence to suggest that this mid-July evening was chilly. It is thus not reasonable to infer that Valdez needed to retrieve a jacket for warmth. Considering all the circumstances, the trial court reasonably inferred that the purpose of the jacket was to conceal a firearm and that purpose would have been obvious to his fellow gang members.

18

In support of his position that he did not see a gun, defendant goes so far as to affirmatively assert that Valdez did not draw his gun until he was chasing Imperial. Adding that when Imperial broke away Valdez, unexpectedly and on his own, decided to pull out a gun. Defendant concludes that no one saw a gun until then, relying on Segoviano's testimony that he did not see a firearm until Valdez chased Imperial down and fired at him. Defendant fails to cite to the trial record that Valdez was identified as the shooter or that the shooter drew his gun only after Imperial ran from his assailants, or for his suggestion that Segoviano saw the shooter pull out his gun. Segoviano did not identify Valdez as the shooter, and he testified that he did not see a gun, only flashes. Defendant offers only speculation, and as defendant has stated multiple times in his briefs, speculation is not evidence. (See *People v. Waidla* (2000) 22 Cal.4th 690, 735.)

Defendant argues that even if proved he knew Valdez was armed with a gun, that would not support an inference of awareness that Valdez would use it to murder Imperial. Defendant concludes that there was no credible, reliable or solid evidence showing awareness that Valdez was armed or an intent by defendant to aid and abet Valdez in an assault with a firearm. As we have discussed, the circumstances provide substantial evidence that Valdez armed himself after defendant, Tracchia and the other man made plans to isolate Imperial from his friends, took him to a relatively secluded place, and assaulted him while one of them carried a firearm. In addition, the fact that one of them remained in the car in the middle of the street with the lights out, ready for the quick getaway it made

19

immediately after the last shot was fired, indicated that the three men intended something far more serious than a simple assault.[5]

We agree with the People that whether defendant was one of the two who assaulted Imperial or remained in the car as the getaway driver, substantial evidence established that he displayed a conscious disregard for Imperial's life, as he either drove his companions to and from the scene or he ran from the scene and fled in the car immediately after the gunfire, under circumstances that he would most certainly know that the victim was probably injured or dying.

We thus conclude that substantial evidence supported the denial of defendant's former section 1170.95 petition.

## DISPOSITION

The order denying the petition is affirmed.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.

---

[5] The trial court inferred that Tracchia remained in the car, as it belonged to his grandmother, and he often drove the vehicle.